**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**


| | | |
|---|---|---|
| STANFORD FOWLER, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | C. A. No. 14A-01-001 MJB |
| | ) | |
| STATE OF DELAWARE, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |


Submitted: October 6, 2014
Decided: January 28, 2015


*Upon Appellant's Appeal from the Industrial Accident Board's Decision,* **AFFIRMED**.


**OPINION AND ORDER**

William R. Peltz, Esquire, Kimmel, Carter, Roman, Peltz & O'Neill. P.A., 56 West Main Street, 4th Floor, Christiana, Delaware, 19702, *Attorney for Appellant*.

Francis X. Nardo, Esquire, Andrew M. Lukashunas, Esquire, Tybout, Redfearn & Pell. P.A., 750 Shipyard Dr., Suite 400, Wilmington, Delaware, 19801, *Attorneys for Appellee*.


**BRADY, J.**

1

## I. INTRODUCTION

Appellant Stanford Fowler ("Appellant," "Fowler") appeals the decision of the Industrial Accident Board (the "IAB," the "Board") denying him compensation for work injuries that he allegedly suffered as a result of an incident on April 9, 2011. Fowler claims that he was injured while working for Appellee State of Delaware ("Appellee," "Employer") at the Port of Wilmington (the "Port"). The injuries allegedly occurred when Fowler intervened in an attempt to stop a coworker's out-of-control forklift. Shortly after his alleged injury, in 2011, Appellant filed an initial Petition to Determine Compensation Due, which was subsequently withdrawn by Appellant.[1] On April 8, 2013, Fowler filed the instant Petition to Determine Compensation Due ("IAB Petition"). After a hearing on the merits (the "Hearing"), the Board determined that Fowler failed to meet his burden of demonstrating that he suffered an injury or aggravation of an injury as a result of the April 9, 2013 incident. In a decision dated December 2, 2013, the IAB denied compensation to Fowler.[2]

Following the IAB's denial of benefits, Fowler filed the instant appeal in Superior Court. Briefs were submitted, and the matter was received in Chambers on October 6, 2014. For the reasons given below, the Court now **AFFIRMS** the decision of the IAB.

---

[1] Transcript of IAB Hearing ("Hearing Transcript") at 7.
[2] Decision of the Industrial Accident Board, December 2, 2013 ("IAB Decision").

## II. FACTS AND PROCEDURAL BACKGROUND

### A. Appellant's Previous Accidents and the Instant Incident

Prior to the accident at issue, Appellant had been involved in a motor vehicle accident in February 2010[3] and a separate work forklift incident in April 2010.[4] Appellant's testimony on the effects of the February 2010 motor vehicle accident was somewhat inconsistent. At one point in the Hearing, Appellant testified that the injuries from the February 2010 accident were to his left side, shoulders, and knee.[5] Later in the hearing, however, Appellant insisted that these injuries were only on his left side.[6] When it was pointed out that the medical records indicate injuries on both sides, Appellant revised his assessment to say that the injury was "mainly" on his left side.[7] Appellant was treated by a chiropractor for his injuries from the 2010 motor vehicle accident.[8] While the chiropractor's records indicate general treatment of Appellant's neck and back, Appellant maintained that it was only for pain in his left side.[9]

As a result of the April 2010 forklift incident, Appellant was taken to the hospital.[10] Appellant reported injuries to his back and shoulder "on [his] right side."[11] Appellant was deemed totally disabled from April to September 28, 2010 due to the April 2010 incident, and Appellant received worker's compensation.[12] Appellant was treated for his injuries by Dr. Emmanuel Devotta until about October 2010, after which Appellant received no further treatment until after the April 9, 2011 accident.[13]

---

[3] Hearing Transcript at 60.
[4] Hearing Transcript at 5, 57.
[5] Hearing Transcript at 60.
[6] Hearing Transcript at 74.
[7] Hearing Transcript at 76-77.
[8] Hearing Transcript at 82-83.
[9] Hearing Transcript at 83.
[10] Hearing Transcript at 58.
[11] Hearing Transcript at 58.
[12] Hearing Transcript at 58, 85.
[13] Hearing Transcript at 59.

On Saturday, April 9, 2011, Appellant was working as a forklift operator at the Port of Wilmington. While Appellant was operating his own forklift, a coworker suffered a medical emergency that caused the coworker to lose control of the forklift he was operating.[14] The coworker's forklift began spinning around with its forks in the air, creating a hazardous situation.[15] Along with several other coworkers, Appellant attempted to intervene to stop the rogue forklift. Appellant testified that he intentionally bumped the rogue forklift with his own forklift in an attempt to stop it, but he was unable to do so.[16] Another coworker, identified as "Rock," was eventually able to stop the rogue forklift; and Milton Downs, another forklift operator, removed the key.[17] After the incident, some of the workers involved were taken away by the security guard so that they could receive medical attention.[18] It is unclear whether Appellant was aware that the other workers had been taken away for medical treatment. Appellant's supervisor allegedly directed the remaining workers to "go back to work," and Appellant testified that he did not want to be insubordinate by not returning to work.[19] Appellant testified that he was "feeling somewhat funny" after the incident, but he wanted to keep working.[20] He decided to wait and see how he felt later. Appellant testified that he did not think that work injuries needed to be reported immediately but that an employee could observe his condition and report the injury at a later date if his condition did not improve.[21] Appellant worked the rest of the day and then went home.[22]

Appellant testified that when he woke the next morning, the pain was still there and was

---

[14] Hearing Transcript at 4.
[15] Hearing Transcript at 15.
[16] Hearing Transcript at 52.
[17] Hearing Transcript at 43.
[18] Hearing Transcript at 44.
[19] Hearing Transcript at 52, 63.
[20] Hearing Transcript at 53.
[21] Hearing Transcript at 62.
[22] Hearing Transcript at 62.

4

getting worse. Appellant says he went into work and spoke to the manager around 6:45 a.m. as the manager was handing out the morning's assignments and explained that he was in pain.[23] Appellant says that the manager acknowledged Appellant's statement but gave Appellant an assignment anyway.[24] Appellant testified that he then went to another supervisor and told him that he would like to be examined because he had been in an accident.[25] Appellant was taken to the hospital by a security guard that Sunday morning. At the hospital, Appellant was examined and given pain medication.[26] Appellant testified that at the time he went to the hospital, he had pain in the neck, low back, and shoulders, and he started feeling pain where he had experienced it before due to his previous accidents in 2010.[27] Appellant reported that his back was worse than the other areas.[28]

Appellant followed up with Dr. Devotta on Monday, April 11, 2011.[29] Dr. Devotta examined Appellant, prescribed medication, and took Appellant out of work for two weeks.[30] Appellant saw Dr. Devotta every couple months through the fall of 2011 and had chiropractic treatment throughout the summer.[31] Appellant confirmed that his symptoms from the April 2011 forklift accident were similar to those from the 2010 work accident.[32]

Appellant testified that he was able to go back to work around July 2011 but that he could not work at the Port because he was restricted to "light duty" and/or because there was not enough work available.[33] Appellant testified that he collected unemployment for at least some

[23] Hearing Transcript at 53
[24] Hearing Transcript at 54.
[25] Hearing Transcript at 54.
[26] Hearing Transcript at 54.
[27] Hearing Transcript at 55.
[28] Hearing Transcript at 55.
[29] Hearing Transcript at 56.
[30] Hearing Transcript at 56-57.
[31] Hearing Transcript at 57.
[32] Hearing Transcript at 98.
[33] Hearing Transcript at 69.

5

time during the period between the 2011 incident and his filing of the instant IAB Petition.[34] It is unclear from the IAB Decision or the Hearing Transcript when and if Appellant has worked at the Port since the 2011 incident.[35] Appellant testified that he had also been in another motor vehicle accident "a few weeks" prior to his testimony at the IAB Hearing on October 15, 2013 and that this accident also caused pain in his lower back, shoulders, legs, and neck.[36]

## B. The IAB Petition and the October 15, 2013 Hearing

On April 8, 2013, Fowler filed the instant IAB Petition, alleging "injuries to various areas of the body" arising from the April 9, 2011 incident. A hearing was held on October 15, 2013. Dr. Devotta testified by deposition on Appellant's behalf.[37] Dr. Devotta testified that he first treated Appellant on April 16, 2010, when Appellant was referred to him for a work-related injury.[38] After an evaluation, Dr. Devotta diagnosed Appellant with "lumbar radiculopathy."[39] Appellant had a lumbar epidural injection in August 2010, which seemed to relieve his pain to some extent.[40] Appellant's last appointment related to the 2010 incident was around September 2010.[41] At this time, Appellant reported that he felt much better, and Dr. Devotta medically released him.[42] Dr. Devotta testified that he did not see Appellant again until after the April 2011 incident.[43] At that time, Appellant reported pain in his low back, radiating down his legs—

---

[34] Hearing Transcript at 69.
[35] When asked if he is currently working with the Port, Appellant replied, "I work with the Port, for the Port [*sic*] but that at this time I chose not to go because there's not much work there and we get unemployment so I stay home." Hearing Transcript at 70. Opposing counsel asked, "All right, so even though if [*sic*] your number does come up you don't go in because you don't want to jeopardize your unemployment?" Hearing Transcript at 70. Appellant answered, "No, I have to go if my number is called, they don't call a number." Hearing Transcript at 70.
[36] Hearing Transcript at 71.
[37] Devotta Deposition, Exhibit D to Item 13, ("Devotta Depo.") at 5.
[38] Devotta Depo. at 5.
[39] Devotta Depo. at 5.
[40] Devotta Depo. at 5-6.
[41] Devotta Depo. at 6.
[42] Devotta Depo. at 6.
[43] Devotta Depo. at 7.

6

specifically, his right leg.[44]  Upon physical examination. Dr. Devotta observed that Appellant had tenderness in his back at L4 and S1, which Devotta characterized as an exacerbation of the injuries Appellant had suffered in the past.[45]  Devotta said that, after the April 2011 incident, Appellant had "lumbar disk protrusion at L4-L5 and L5-S1."[46]

Dr. Andrew J. Gelman examined Appellant on behalf of Employer on August 27, 2013.[47] Dr. Gelman concluded that there was no objective evidence of an injury or exacerbation of a previous injury due to the April 9, 2011 incident.[48]  Gelman testified that his examination of Appellant was "normal" and opined that, at most, Appellant had sustained soft tissue injury.[49] Gelman clarified that even the possible diagnosis of soft tissue injury was based entirely on Appellant's subjective reports of pain rather than objective evidence of injury.[50]  Dr. Devotta disagreed with Dr. Gelman's conclusions that Appellant's exam was normal and Appellant merely had soft tissue injury.[51]  However, Dr. Devotta clarified that he could not testify with certainty about Appellant's condition at the time of Dr. Gelman's exam in August 2013 as Devotta had not examined Appellant since August 2012.[52]

Julius Cephas ("Cephas"), a coworker who was present at the April 9, 2011 incident, testified on behalf of Appellant.[53]  Cephas testified that he witnessed the incident take place, but he acknowledged that the incident was confusing and everything happened very fast.[54]  Cephas was not sure what Appellant specifically did during the incident beyond that Appellant was one

---

[44] Devotta Depo. at 8.
[45] Devotta Depo. at 28.
[46] Devotta Depo. at 12.
[47] Gelman Deposition, Exhibit C to Item 13, ("Gelman Depo.") at 5.
[48] Gelman Depo. at 16.
[49] Gelman Depo. at 20-21.
[50] Gelman Depo. at 21.
[51] Devotta Depo. at 14, 16.
[52] Devotta Depo. at 15.
[53] Hearing Transcript at 14.
[54] Hearing Transcript at 25

of three or four workers trying to stop the rogue forklift.[55] Cephas says at one point that Appellant was on foot and was trying to stop the rogue forklift by grabbing the keys.[56] At another point, Cephas says that Appellant was inside his own forklift and was trying to stop the rogue forklift by bumping it with the machine he was operating.[57] Finally, Cephas suggests that Appellant did both of these things at different times during the incident.[58] Cephas testified that while he thought that all of the men involved might have been hurt due to the dangerous nature of the incident, Cephas did not personally observe Appellant limping or injured in any way following the incident.[59]

Milton Downs ("Downs"), another coworker, testified on behalf of Appellant.[60] Downs said that he observed Appellant bump the rogue forklift twice with Appellant's own forklift in an effort to stop it.[61] Downs testified that Appellant told him that he was injured the next morning at work.[62]

John Stratis ("Stratis"), a field investigator with ICU Investigations, testified on behalf of Employer.[63] Stratis videotaped Appellant on May 11, 2011, and the videotape was admitted as evidence by the Board.[64] Appellant confirmed that the person in the video was in fact Appellant helping his elderly father with a home improvement project.[65] Stratis described what occurred in the relevant portions of the footage. Appellant bent at the waist and used a sledgehammer to

---

[55] Hearing Transcript at 25-26.
[56] Hearing Transcript at 25-26.
[57] Hearing Transcript at 32.
[58] Hearing Transcript at 32.
[59] Hearing Transcript at 22-23.
[60] Hearing Transcript at 37.
[61] Hearing Transcript at 38-39.
[62] Hearing Transcript at 39.
[63] Hearing Transcript at 112.
[64] IAB Decision at 17.
[65] Hearing Transcript at 86.

break up concrete.[66] Appellant carried a 2x4 piece of lumber and dragged a bag of quick-dry concrete.[67] Appellant picked up the bag and poured the contents into a bucket.[68] Appellant then lifted the bucket and poured the mixture into the ground.[69] Stratis testified that he did not observe Appellant limping or any other obvious signs of injury.[70] Appellant objected to the introduction of the videotape and Stratis' testimony on the grounds that Stratis himself was not licensed in Delaware as a private investigator even through his employer ICU Investigations is licensed in Delaware.[71] The Board ultimately overruled this objection and permitted the introduction of the videotape and Stratis' testimony.[72] The Board found that the evidence was probative and not prejudicial to Appellant as Appellant had admitted that he was the person in the video and Appellant's counsel had so stipulated.[73]

### C. The Board's Findings

The Board found that Appellant failed to prove by a preponderance of the evidence that he had suffered injury or aggregation of an existing injury due to the April 9, 2011 incident.[74] The Board found that Appellant failed to demonstrate that the April 9, 2011 incident was the "but for" cause of his alleged injuries/aggravation of existing injuries.[75] The Board found Dr. Devotta's testimony to be completely unpersuasive, finding that it "reflected a complete lack of

---

[66] Hearing Transcript at 120.
[67] Hearing Transcript at 120.
[68] Hearing Transcript at 120.
[69] Hearing Transcript at 123-124.
[70] Hearing Transcript at 127.
[71] Hearing Transcript at 114.
[72] IAB Decision at 17, n. 11. The Board cited Board Rule 14(c), which gives the IAB discretion to admit evidence that, in the Board's opinion, "possesses any probative value commonly accepted by reasonably prudent persons in the conduct of their affairs," even if such evidence would not be admissible under the Rules of Evidence applicable to a proceeding in Superior Court.
[73] IAB Decision at 17, n.11.
[74] IAB Decision at 22.
[75] IAB Decision at 23.

9

understanding of the events surrounding the incident in question."[76]  The IAB found Dr. Devotta's testimony on causation to be "largely uninformed, confused at times with the prior April 2010 incident[,] and predominately based on [Appellant's] own conclusion that he had suffered a 'reoccurrence' of all of the injuries he had suffered in his prior forklift accident."[77]

The Board gave credence to Dr. Gelman's testimony that there appeared to be no real objective change in Appellant's condition after the more recent forklift incident.[78]  The Board accepted Dr. Gelman's opinion that Appellant's diagnosis in relation to the present incident was based on Appellant's subjective complaints and was not distinguishable from Appellant's preexisting conditions.[79]

The Board found that Appellant was not credible regarding the April 9, 2011 incident itself or his actions in the aftermath of the incident.[80]  The Board noted that Appellant "was very vague about what had happened and did not put forth any theory of how each of the many body parts he alleges were injured were actually injured."[81]  The Board noted that Appellant provided "little or no testimony… indicating anything actually happening to [Appellant's] body during this incident."[82]  Considering Appellant's allegations that he received injuries to multiple body parts, the IAB found it "strange" that Appellant provided much detail concerning what happened with regard to the rogue forklift operator but did not explain how and why he personally was injured.[83]  Regarding Appellant's actions after the incident, the Board "did not find persuasive that [Appellant] did not know the other workers involved in the incident had gone to the hospital or that he was injured but felt he should just return to work anyway to avoid being

---

[76] IAB Decision at 23.
[77] IAB Decision at 23.
[78] IAB Decision at 23.
[79] IAB Decision at 24.
[80] IAB Decision at 24.
[81] IAB Decision at 24.
[82] IAB Decision at 24.
[83] IAB Decision at 24.

10

insubordinate."[84]  The Board did not believe Appellant's testimony that he did not think that he needed to report a work injury immediately, given that Appellant had gone through the process for his previous work-related injury the year before.[85]

The Board also found Appellant's testimony concerning his symptoms questionable. About a month after the incident, at the same time that Appellant was reporting "unbearable pain," the video was taken showing Appellant performing strenuous labor with concrete.[86]  The Board found that Appellant's testimony reflected that he had listed many of the body parts as injured in his petition "merely because [Appellant] considered [the present incident] to be a 'recurrence' of his prior injuries."[87]  Appellant testified that he was already medicating for his prior injuries at the time of the instant accident, and the Board found that Appellant's alleged injuries from the instant accident could not be separated from his preexisting symptoms.[88]  The Board did not find Appellant's testimony credible, "which was problematic, especially given Dr. Devotta's heavy reliance on Claimant's subjective history and complaints in rendering his opinion on causation."[89]  On the basis of all of these findings, the Board denied Appellant's petition.

### III. PARTIES' CONTENTIONS

Appellant advances three grounds on which he argues the IAB decision should be reversed.  First, Appellant contends that the Board's decision to admit the video recorded by a investigator not licensed in Delaware constituted reversible error.  Second, Appellant contends

---

[84] IAB Decision at 24.
[85] IAB Decision at 24-25.
[86] IAB Decision at 25.
[87] IAB Decision at 25.
[88] IAB Decision at 25-26.
[89] IAB Decision at 26.

that the Board's decision that there was no objective finding of injury was not based on substantial evidence in the record. Third, Appellant argues that the Board erred as a matter of law in applying a heightened standard of proof.[90]

In support of his first argument, Appellant cites 24 *Del. C.* §1303, which proscribes penalties for persons who engage in the business of a private investigator without a Delaware license.[91] Stratis was not licensed in Delaware as a private investigator at the time he investigated Appellant and recorded the video footage of Appellant working with concrete. Appellant argues that the licensing requirement precludes the introduction of evidence or testimony from unlicensed investigators as a matter of public policy. Appellant argues that the purpose of the licensing law is to protect the people of Delaware from invasions of privacy by unlicensed persons.[92] Appellant further argues that it would diminish the credibility of testimony from a private investigator were the licensing requirement not strictly followed; "[a]nyone could then get on the stand and claim to be a private investigator or an expert in that field, which would diminish the value of the judicial system and what it means to be a private investigator."[93] Appellant cites an Ohio case involving a "nearly identical" statute, where the appellate court held that "the trial court erred in allowing the testimony of two defense expert witnesses who were not licensed in Ohio as private investigators and whose testimony was based on an investigation conducted in contravention of [the licensing statute]."[94]

Appellant further argues that there was substantial evidence submitted showing that Appellant did sustain injuries in the April 9, 2011 accident and that the IAB finding of no

---

[90] Opening Brief, Item 18.

[91] Opening Brief, Item 13, at 9. 24 *Del. C.* §1303 references 24 *Del. C.* §1329, which provides, "No person shall engage in the business of a private investigator…without first obtaining a license from the Professional Licensing Section, Division of State Police."

[92] Opening Brief, Item 13, at 10.

[93] Opening Brief, Item 13, at 10.

[94] Opening Brief, Item 13, at 10 (*quoting Donegal Mutual Ins. Co. v. White Consol. Indus.*, 795 N.E.2d 133 (Ohio Ct. App. 2003)).

objective injury was not supported by the evidence.[95]  Specifically, Appellant cites testimony of Dr. Gelman describing the report of the emergency room physician who treated Appellant the day after the accident (diagnosing Appellant with acute low back strain and right hip stain and excusing Appellant from work for one day);[96] and the report of Dr. Covington, who examined Appellant on behalf of employer a few days after the April 9, 2011 incident (reporting, in a section titled "objective," symptoms including tenderness of paraspinal muscles lateral to the L4-5").[97]  Appellant argues that the Board erred as a matter of law in finding no objective evidence of injury when there clearly was this objective evidence.

Finally, Appellant argues that the Board applied the wrong standard of proof concerning causation of Appellant's injuries.[98]  Appellant contends that while a personal injury action at court requires the plaintiff to show that the accident caused the injury "by reasonable medical probability," the standard is lowered in proceedings before the IAB.[99]  Appellant argues that in an IAB hearing, "[m]edical experts do not need to believe that there is a probability that the trauma caused the injury, so long as it is more than just a possibility."[100]  Appellant maintains that it is sufficient that the medical expert find that the injury is consistent with the mechanism of injury described by the patient.[101]  Appellant argues this is especially true "where the injury occurred directly and uninterruptedly after the trauma."[102]  Appellant maintains that he produced "sufficient evidence to show that his injuries are consistent with the trauma from the accident"

---

[95] Opening Brief, Item 13, at 16.
[96] Opening Brief, Item 13, at 16 (*citing* Exhibit C at 38).
[97] Opening Brief, Item 13, at 16 (citing Exhibit C at 39-40).
[98] Opening Brief, Item 13, at 18.
[99] Opening Brief, Item 13, at 18 (*citing Air Mod Corp. v. Newton*, 215 A.2d 434 (Del. 1965)).
[100] Opening Brief, Item 13, at 18.
[101] Opening Brief, Item 13, at 19 (*citing Happy Harry's Discount Drugs v. Soltis*, 2003 WL 1903775, *6 (Del. Super. Ct. Mar. 21, 2003)).
[102] Opening Brief, Item 13, at 18 (*quoting General Motors Corp. v. Freeman*, 164 A.2d 686, 688-89 (Del. 1960)).

13

even if he could not describe with particularity how each injury occurred.[103] None of the medical experts testified that Appellant's symptoms were inconsistent with the alleged trauma.[104]

Employer contends that the Board properly admitted the video evidence and gave the video evidence the weight it was due.[105] Employer argues that while the statute sets forth penalities for unauthorized private investigators, the statute is "wholly silent as to the impact of licensure on the admissibility of testimony."[106] Employer argues that the Ohio case cited by Appellant, *Donegal Mut. Ins. Co. v. White Consol. Indus.*, is inapplicable to the instant case.[107] Employer disputes Appellant's characterization of the Ohio statute as "nearly identical" and argues that the case cited by Appellant only addressed the narrow issue of "whether a fire investigator was allowed to render a causation opinion regarding the origin of a fire."[108] Employer argues that the *Donegal* investigator's opinion on causation, unlike the testimony of the investigator in the instant case regarding the taking of the video, concerned "a far more crucial element of a case and one where the State would have a rational interest in regulating 'experts' and their qualifications to render a causative opinion in a legal proceeding."[109] Employer also argues that Appellant waived his objection to the admission of the video by addressing the existence of the footage during Appellant's opening remarks without any objection to the same.[110] Further, Employer argues that upon cross-examination Appellant acknowledged the actions depicted in the video, admitted that he was the individual in the footage, and explained the impact of the activities in the video on his symptoms.[111] Employer

---

[103] Opening Brief, Item 13, at 20.
[104] Opening Brief, Item 13, at 21.
[105] Answering Brief, Item 15, at 13.
[106] Answering Brief, Item 15, at 14 (*citing* 24 *Del. C.* §1301 et seq.).
[107] Answering Brief, Item 15, at 15 (citing *Donegal*, 795 N.E. 133).
[108] Answering Brief, Item 15, at 15
[109] Answering Brief, Item, 15, at 15.
[110] Answering Brief, Item 15, at 13.
[111] Answering Brief, Item 15, at 13.

argues that because Appellant authenticated the contents of the video footage, any objection from Appellant thereafter was untimely.[112]

Employer further argues that the Board correctly concluded that Appellant did not sustain his burden of proof with respect to causation.[113] Employer contends that the Board's decision was amply supported solely by examining Dr. Devotta's testimony—specifically, that Dr. Devotta was unaware of the precise mechanism of injury, could not confirm whether Appellant was involved in a collision or a fall, and was uninformed with regard to Appellant's medical history and 2010 motor vehicle accident.[114]

In response to Appellant's final argument, Employer argues that the Board applied the appropriate standard of proof.[115] Employer argues that the Board did not hold Appellant to a higher standard, but rejected Appellant's theory as to the causation of his symptoms "not because [Appellant] could not reach a standard of medical probability, but because neither [Appellant's] testimony, nor his expert's[,] was persuasive to the Board."[116]

## IV. STANDARD OF REVIEW

The scope of this Court's review of a decision by the IAB is limited to determining whether the IAB decision is supported by substantial evidence[117] and free from legal error.[118] Substantial evidence consists of "more than a scintilla but less than a preponderance,"[119] and must be "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[112] Answering Brief, Item 15, at 13.
[113] Answering Brief, Item 15, at 19
[114] Answering Brief, Item 15, at 19.
[115] Answering Brief, Item 15, at 22.
[116] Answering Brief, Item 15, at 22.
[117] *General Motors Corp. v. Freeman*, 164 A.2d 686, 689 (Del.1960).
[118] *Boone v. Syab Servs./Capitol Nursing*, 2012 WL 3861059, *1 (Del. Super. Ct. Aug. 23, 2012).
[119] *Olney v. Cooch*, 425 A2d 610, 614 (Del. 1981).

conclusion."[120] Freedom from legal error exists when "the [Industrial Accident] Board properly applied the relevant legal principles."[121] In reviewing the record for substantial evidence, this Court will consider the record in the light most favorable to the prevailing party.[122] Unless no substantial evidence supports a decision by the IAB, this Court must uphold its decision.[123] This Court must defer to the IAB's expertise,[124] and decline to weigh the evidence, resolve credibility questions, or make its own factual findings.[125]

## V. DISCUSSION

### A. The Video Evidence and Licensing Issue

Delaware courts have repeatedly held that evidentiary rulings, whether by a trial court or an administrative board, are reviewed for an abuse of discretion.[126] "An administrative board abuses its discretion in admitting or excluding witness testimony where its decision exceeds the bounds of reason given the circumstances or where rules of law or practice have been ignored so as to produce injustice."[127]

During the IAB hearing, Appellant confirmed that he was the person in the video and that the events depicted actually took place. Unlike in *Donegal*, where the investigator's opinion was relied upon to establish a crucial element of the case, the investigator in the instant case simply explained the video that Appellant himself authenticated.[128] Appellant makes the public policy argument that allowing a video from an unlicensed investigator into evidence will give an

---

[120] *Id.*
[121] *State v. Kasi*, 1994 WL 637028, at *4 (Del. Super. Ct. Mar. 11, 1994).
[122] *Boone*, 2012 WL 3861059, at *1.
[123] *Person-Gaines v. Pepco Holdings, Inc.*, 981 A.2d 1159, 1161 (Del. 2009).
[124] *Noel-Liszkiewics v. LA-Z-BOY, Inc.*, 2012 WL 4762114, at *8 (Del. Super. Ct. Oct. 3, 2012).
[125] *Id.*
[126] *See, e.g., Wal-Mart Stores, Inc. v. Clough*, 712 A.2d 476 (Del. 1998).
[127] *Bolden v. Kraft Foods*, 2003 WL 3526324, *2 (Del. Dec. 21, 2005).
[128] *Donegal*, 795 N.E.2d 133.

16

incentive to private citizens to invade each other's privacy. Appellant argues that absent licensure of private investigators, "people would just take their smart phones out of their pocket[s] and record another's personal activities."[129] In violating this public policy, Appellant contends that the Board exceeded the bounds of reason in permitting the video evidence. The Court finds no such abuse of discretion. Video evidence from a lay person, even if obtained illegally, can be introduced as evidence in court so long as it is relevant.[130] Thus, Appellant's argument that the Board's ruling will create incentives to engage in illegal surveillance is uncompelling. Regardless of whether or not the investigator's actions in this case were illegal, the Board acted reasonably in permitting the evidence. It was independently authenticated by Appellant, case law supports the admission of the evidence, and there is no compelling showing that admitting such evidence creates an incentive to violate the law in contravention of public policy.

## B. The Evidence in the Record

Appellant argues that the Board erred in finding against him because there was substantial evidence in the record that Appellant had an "objective" injury.[131] Appellant's reasoning is doubly flawed. First, Appellant misconstrues the present standard of review. This Court is charged with deciding not whether there is substantial evidence to support Appellant's conclusion, but rather whether there is substantial evidence to support the Board's finding.

---

[129] Opening Brief, Item 13, at 10.

[130] While the Court finds no Delaware case precisely on point, there is a line of Delaware child custody cases in which wrongfully obtained evidence was deemed admissible. See, e.g., *Aladino R.T. v. Brenda W.*, 1993 WL. 331843 (Del. Fam. Ct. Mar.23, 1993); *G.J.G. v. L.K.A.*, 2006 WL 2389340 (Del. Fam. Ct. Apr. 11, 2006). Other jurisdictions that have dealt explicitly with the question of whether relevant, wrongfully obtained evidence is admissible in civil cases have routinely found such evidence admissible. *See, e.g., United States v. Janis,* 428 U.S. 433, 454 (1976); *Herndon v. Albert*, 713 S.W.2d 46, 47 (Mo. Ct. App. 1986); *State Farm Fire & Cas. Co. v. Madden,* 451 S.E.2d 721, 726 (W. Va. 1994).

[131] Opening Brief, Item 13, at 16.

There may be "substantial evidence" on both sides. Thus, Appellant's contention that there was substantial evidence in support of his claim misses the mark; what is relevant is that there is substantial evidence on the basis of which the Board reasonably found that Appellant did not sustain a compensable injury due to the April 9, 2011 forklift incident. In this case, a reasonable Board could have found the testimony of Employer's medical experts more credible than that of Appellant's experts. Similarly, a reasonable Board could have found the video evidence of Appellant's physical capabilities more compelling than the reports of doctors who examined Appellant after the incident and found injury.

Second, all of the evidence cited by Appellant is evidence that he had some injury. Even if the Board accepted that Appellant was injured, Appellant would still have to establish that the injury and/or exacerbation was caused by the April 9, 2011 incident. The Board doubted this causal connection.[132] A reasonable Board could have found that even if there was sufficient evidence that Appellant was injured, there was not sufficient evidence that Appellant's injuries were due to the April 9, 2011 incident as opposed to an earlier forklift incident, two automobile accidents, or some other cause. Because Appellant admitted that he had been in three other accidents in addition to the incident in question (the 2010 motor vehicle accident, the 2010 forklift accident, and the more recent motor vehicle accident) and that all of these accidents had caused similar symptoms concerning his neck, shoulders, and/or back, a reasonable Board could find insufficient evidence that the reported injuries were caused by the April 9, 2011 incident. Because Appellant's testimony concerning his injuries was often vague and perhaps conflicting, a reasonable Board could have found him not to be credible.

---

[132] See, e.g., IAB Decision at 25 (*questioning* whether symptoms that Appellant reported to Dr. Devotta were "simply part and parcel of [Appellant's] pre-existing condition" and *observing* that the evidence indicates that Appellant had "an ongoing condition in relation to the February 2010 [motor vehicle accident]).

## C. The Standard of Proof

Appellant contends that IAB proceedings invoke a lower standard of proof than is required in personal injury actions at court.[133] Specifically, Appellant's theory is that IAB proceedings require the claimant to show only mere consistency with the mechanism of injury proposed by the claimant, whereas actions at court require a showing of "reasonable medical probability."[134] Since there was no evidence that Appellant's injuries were inconsistent with his alleged mechanism of injury, Appellant argues that the Board must find causation.[135] Appellant cites three cases in support of his proposition that that the lower standard applies in IAB proceedings: *Air Mod Corp. v. Newton*, 215 A.2d 434 (Del. 1965); *Happy Harry's Discount Drugs v. Soltis*, 2003 WL 1903775 (Del. Super. Ct. Mar. 21, 2003), and *General Motors Corp. v. Freeman*, 164 A.2d 686 (Del.1960); but Appellant has misstated the law as defined in these cases. All three of these cases are situations in which employers appealed the IAB's grant of compensation to the claimant. On appeal, the courts found that the IAB's finding of a compensable injury was not to be disturbed as the Board's finding in each case was supported by substantial evidence. There is not a lower burden of proof placed on the claimant in an IAB matter; rather, there is a higher burden placed upon the court in overturning an IAB decision. The claimant still must prove causation by reasonable probability, but the Board is the judge of whether this burden has been met. The court will only overturn the Board's decision if the Board "acts arbitrarily or capriciously" or the Board's conclusion "exceeds the bounds of reason."[136]

The Board acted within its authority as the trier of fact in finding Employer's experts

---

[133] Opening Brief, Item 13, at 18.

[134] Opening Brief, Item 13, at 18.

[135] Opening Brief, Item 13, at 19.

[136] *Delaware Transit Corp. v. Roane,* 2011 WL 3793450, *5 (Del. Super. Ct. Aug. 24, 2011) (*quoting Straley v. Advanced Staffing, Inc.,* 2009 WL 1228572, *2 (Del .Super. Ct. Apr. 30, 2009)).

more credible than Appellant's experts and in finding Appellant's own testimony not to be credible. As the Board's findings are supported by substantial evidence and free from legal error, this Court must affirm.

## VI. CONCLUSION

For the foregoing reasons, the decision of the IAB is hereby **AFFIRMED**.


**IT IS SO ORDERED.**


_____/s/_____
**M. JANE BRADY**
Superior Court Judge
